UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>PAOLO MEREGALLI,<br><br>        Debtor, | Chapter 7<br><br>Case No. 20-10716-smb |
| ROY FOOD AND WINE LLC, I.K. FINANZIARIA SRL,<br>individually and as members of F & W INTERNATIONAL<br>LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>PAOLO MEREGALLI,<br><br>        Defendant. | Adversary Proceeding<br><br>No.<br><br>**COMPLAINT** |

Plaintiffs Roy Food and Wine LLC ("Roy") and I.K. Finanziaria S.r.L. ("IK"), together

"Plaintiffs," individually and derivatively as members of F&W International LLC, by and through

their undersigned attorneys, bring this complaint against Defendant Paolo Meregalli ("Meregalli"),

objecting to discharge under §§ 523(a)(4), 523(a)(6) and 727(a)(4)(A) of the Bankruptcy Code,

and in support thereof alleges the following.

### NATURE OF THIS ACTION

1.     Plaintiffs are members, along with Meregalli, of F & W International LLC (the

"Company"), which operated wine bar and Italian restaurant in the meat packing district of New

York City, called Mulino a Vino ("MAV").

2.      In October 2013, Meregalli induced Plaintiffs Roy and IK to invest a total of $413,750 of capital and loans into the Company in exchange, respectively, for 20% and 15% interests in the Company. Meregalli represented to Plaintiffs that, as the initial 60% owner of the Company, he would make proportional contributions of capital—or $600,000.

3.      In fact, as Plaintiffs discovered, it was never Meregalli's intent to invest any substantial amount of his own funds into the Company. Despite failing to make such proportional investments of capital, Meregalli falsely claimed a 60% interest in the Company and the role of Managing Member. This was in breach of the clear terms of the Company's Operating Agreement, which—as Meregalli admitted in an email—adjusts the percentage interests of the members based upon the amount of capital each member actually has contributed. Under the terms of the Operating Agreement, Meregalli was entitled only to a small percentage interest, and was subject to removal as managing member at any time.

4.      To conceal his lack of investment, and maintain his control, Meregalli fraudulently claimed to Plaintiffs in financial statements, as well as in the Company's tax returns, that he made capital contributions to the Company totaling $600,000. Of the amounts he claimed, however, it cannot be disputed that Meregalli did not pay the following amounts, totaling $502,985.51:

- $283,856.51 paid by the Company's landlord, in connection with the build out of the restaurant premises, as Landlord's Work under the lease;

- $109,203.00 paid to Tri-State Construction Company, also in connection with the buildout, which was paid from the Company's bank account with Chase; and

- $109,917, the amount contributed to an escrow account by Meregalli's friend, Alberto Baldaccini, which was not Meregalli's money.

Although Meregalli's own personal bank records reflect that he made a number of loans to the Company (the "Meregalli Loans")—the source of which actually was Meregalli's wealthy

girlfriend—Meregalli cannot document paying much, or any, of the remaining $97,014.49.

5.      Having arrogated control over the Company by false pretenses, Meregalli breached his fiduciary duties to Plaintiffs by diverting their capital contributions, and the earnings of the Company, to finance a jet-setting lifestyle of personal travel and entertainment.

6.      When Plaintiffs discovered Meregalli's impecunious and disloyal conduct, Meregalli responded with further gross breaches of his fiduciary duties to Plaintiffs. Meregalli (1) formed a competing Italian restaurant—First LLC d/b/a Raviolo NYC ("Raviolo"), using the employees and assets of the Company; (2) milked over $250,000 from the Company into his own personal account, as well as to pay his own personal legal expenses; (3) failed to pay the Company's rent, ran the Company into the ground, and wholly lost Plaintiffs' investments; and (4) transferred MAV to a new location, in a new limited liability company in which Plaintiffs were not members, under the thinly-disguised name MAV SOHO—along with the Company's chef, and $100,000 from the Company's bank account.

7.      On August 17, 2017, Plaintiffs brought action against Meregalli, the Company and Raviolo in the Supreme Court of the State of New York, in a matter captioned *Roy Food and Wine LLC, I.K. Finanziara SRL, individually and as members of F & W Int'l LLC, v. Paolo Mergalli, F&W Int'l LLC, and First LLC*, Index No. 655430/2017 (the "State Court Action"), stating claims for fraud breach of fiduciary duty, breach of contract, unfair competition, misappropriation of a corporate opportunity and for an equitable accounting..

8.      After substantial discovery, by Order, dated September 25, 2019, the Honorable O. Peter Sherwood denied the Defendants' motion for summary judgment as to Plaintiffs' claims for breach of fiduciary duty, breach of contract, unfair competition, misappropriation of a corporate opportunity and for an equitable accounting.

9.      In an attempt to frustrate Plaintiff's recovery in the State Court Action, Meregalli filed the present voluntary petition for bankruptcy, which is riddled with inaccuracies and falsehoods. Upon information and belief, Meregalli—who comes from a wealthy family in Italy— has substantial assets overseas that he has not disclosed in his petition or in its supporting schedules.

10.     After defrauding and breaching his fiduciary duties to Plaintiffs, Meregalli should not be allowed to obtain a discharge of their claims against him. Accordingly, Plaintiff objects to Defendant's discharge under §§ 523(a)(4), 523(a)(6) and 727(a)(4)(A) of the Bankruptcy Code.

## JURISDICTION

11.     This is an adversary proceeding in which the plaintiff-creditor is objecting to the Defendant's discharge under Bankruptcy Code §§ 523(a)(4), 523(a)(6) and 727(a)(4)(A)

12.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 and Bankruptcy Code §§ 523 and 727.

13.     This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and 157(b)(2)(J).

## PARTIES

14.     Plaintiff Roy Food and Wine LLC ("Roy") is a domestic limited liability company organized and existing pursuant to the laws of the state of New York.

15.     Plaintiff I.K. FINANZIARIA SRL ("IK") is a foreign business corporation duly authorized to do business in the State of New York.

16.     Defendant F & W International LLC (the "Company"), is a New York limited liability company with a principal place of business at 337 West 14th Street, New York, NY 10014 and registered agent of Emanuele Tosolini, Tosolini & Lamura LLP, 70 West 36TH Sr.

Ste. 12A, New York, New York, 10018.

17.     Debtor Paolo Meregalli is an individual residing at 29 Jones Street, Apt. 5C, New York, NY 10014.

## PROCEDURAL HISTORY

18.     On March 7, 2020, Defendant filed a voluntary petition (the "Petition") for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York.

19.     On May 5, 2020, the Defendant's duly-noticed meeting of creditors was commenced pursuant to Section 341(a) of the Bankruptcy Code (the "Section 341 Meeting").

20.     By order of the Trustee, Kenneth P. Silverman, the Section 341 Meeting was adjourned to June 9, 2020, on grounds of the numerous deficiencies in Defendant's Petition and accompanying Schedules.

21.     As of the date of this Complaint, Defendant has not been granted a discharge.

22.     This Complaint is timely because the date by which a Complaint objecting to the Debtor's discharge or to determine dischargeability of a debt expires on June 8, 2020.

## STATEMENT OF FACTS

23.     Meregalli is an Italian citizen living in the United States, who holds himself out as a "doctor" of marketing. In or about 2011, Meregalli solicited investments for a restaurant to be opened in New York, named Mulino a Vino. The menu was to be designed by a celebrated Michelin starred Italian chef, Davide Scabin, and focused on pairing food with wine. Edoardo Marchiorello, a principal of Plaintiff IK, was an investor in PVF, Inc. ("PVF"), the entity used to acquire a lease and develop the restaurant.

### A.     Meregalli Loses Substantially All of His Investment in aPrior Venture

24.     Before opening, PVF failed when it descended into costly litigation with its landlord. Over $600,000 in capital invested by the principals was lost. Meregalli lost his entire personal investment of between $100,000-150,000.

25.     In 2013, after the failure of PVF, Meregalli's personal account at JP Morgan Chase Bank reflects that he had savings of under $40,000, and a monthly income—the result of a settlement with a former employer—of under $7,000. Meregalli's bank statements show that he spent his entire monthly income on rent, food, entertainment and other personal expenses, and did not save any substantial amount money.

### B.     Meregalli Forms the Company

26.     On July 25, 2013, Meregalli formed the Company as a vehicle to make a second attempt at developing and operating the Mulino a Vino restaurant concept. Initially, under the original Operating Agreement of the Company, dated July 25, 2013, Meregalli was the sole member of the Company. However, because Meregalli did not have sufficient personal funds to open the restaurant himself, and wished to spread risk, Meregalli planned to raise money from investors that would receive stakes of equity in the Company. Consistent with this, in 2013,

Meregalli stated to Roy's principal, Daniel Noboa, that he needed investor money because he had spent all of his own personal resources in his prior attempt to open the restaurant.

## C.   The Restaurant Lease

27.   On August 20, 2013, Meregalli caused the Company to enter into a commercial lease (the "Lease") with 335-7 LLC, through its managing agent, Superior Management ("Superior"), under which the Company leased the cellar premises of 337 West 14th Street, New York, New York (the "Restaurant Premises" or "Premises") for a term of twelve years, commencing on November 1, 2013. Unbeknownst to Plaintiffs, Meregalli also caused the Company to enter into a lease with Superior for 337 West 14th Street, Apt. 1, a residential apartment to be occupied by Meregalli himself.

28.   Under Section 69 of the Lease, entitled "Landlord's Work," the Superior agreed to build out the new Restaurant Premises substantially at Superior's own expense. Landlord' Work included:

- Installation of a new gas meter for the space, and of gas piping to locations specified in the Tenant's plan;

- Installation of a new air conditioning system with five tons of capacity and the ability to provide supplemental heat if required.

- Installation of new cast iron underground plumbing waste lines to locations indicated on the Tenant's plan, including the installation of a new tenant supplied grease trap (150 lb. capacity; 50 GPM or larger) connected to the waste lines of the Tenant's kitchen.

- Installation of a new concrete floor throughout the Premises, not less than three inches thick, approximately eight inches lower than the existing floor.

- Installation of a Tenant supplied electric hot water heater, including required electrical wiring, cold water supply to the heater and hot and cold-water distribution piping to the two toilet locations indicated on the Tenant's plan. In addition,

installation of new copper hot and cold-water lines to the locations shown on Tenant's plans.

- Installation of a new kitchen exhaust flue as indicated on Tenant's plan.

- Structural work to remove certain existing masonry walls as indicated on the plans of Tenant's architect, Thomas Tsue.

- Installation of two new bathrooms set forth in Tenant's plans, including all new underground waste piping, plumbing vents, new sheetrock partitions and new water supply piping.

- Installation of a new guard rail and handrail system to replace the iron and brick rails which surround the areaway.

- Installation of new sheetrock walls to enclose a new kitchen and one guest toilet, as set forth in Tenant's plans.

- Installation of new metal studs and one layer of sheetrock on all exterior walls and the ceilings, the cavities of which shall be filled with lsocene foam insulation.

- Installation of new Pella brand windows in all existing window openings and one new Pella brand glass door in the door opening to the yard located in the front east area.

- Installation of a new electrical service (200-amp three phase) including a new electrical distribution panel.

29.     Under the Lease, Superior undertook to complete the vast majority of the work necessary to transform the raw Restaurant Premises into the Restaurant, at Superior's own expense. *See id.*

## D.   **Meregalli Solicits Plaintiffs' Investments**

30.     After entering into the Restaurant Lease, Meregalli sought out investors to purchase interests in the Company. Based upon his representation that the Company required $1 million in initial capital to operate, Meregalli solicited $400,000 in initial capital from Plaintiffs and non-party Denz LLC ("Denz"), including investments of $200,000 from Roy (representing an initial 20% interest in the Company), $150,000 from IK (representing an initial 15% interest

in the Company) and $50,000 from Denz (representing an initial 5% interest in the Company).

31.    Meregalli represented to Plaintiffs that, as the initial owner of 60% of the Company, he would make proportional contributions of capital—totaling approximately $600,000. In reliance upon Meregalli's representations, Plaintiffs made their investments in the Company. Meregalli's promises, however, proved to be false. In fact, from the time he solicited Plaintiff's investments, it was Meregalli's intent to operate the Restaurant primarily using the capital contributions of Plaintiffs, while investing little or no money of his own.

**E.    The Operating Agreement**

32.    On or about November 19, 2013, Plaintiffs and Meregalli entered into the Operating Agreement of F&W International LLC (the "Operating Agreement"). By its terms, the Operating Agreement superseded all prior oral or written agreements—including the earlier Participation Agreements—and became the definitive "common agreement" between the parties.[1]

33.    Section 2.1 and Exhibit 3 of the Operating Agreement provide for an initial capital contribution by the Members of $100, and an initial allocation of Membership Interests as follows:

| Name | Initial Contribution | Percentage Interest |
|---|---|---|
| Paolo Meregalli | $60 | 60% |
| Roy Food and Wine LLC | $20 | 20% |
| I.K. Finanziaria S.r.L. | $15 | 15% |
| Denz LLC | $5 | 5% |

---

[1] Meregalli's counsel in connection with forming the Company, Leslie Pasqualone, stated to the investors that the Operating Agreement "is the primary document that establishes the rights, powers, duties, liabilities and obligations of the members between themselves and with respect to the LLC, which in this case is F & W International LLC." In any case, in his deposition, Meregalli admitted that the merger clause in Section 8.1 of the Operating Agreement provides that it "represents the entire agreement" between the parties.

34.   Thereafter, under § 6.2 of the Operating Agreement, to the extent that a Member contributes capital beyond the initial amounts, receives a distribution, or is charged with losses, the percentage interests of each of the Members was to be adjusted accordingly.[2]

35.   Meregalli's subsequent conduct—in fraudulently claiming $600,000 in capital contributions that were made by others—reflects that Meregalli understood that to maintain his initial 60% membership interest in the Company, he had to make capital contributions representing 60% of the total capital contributed to the Company.

**F.     Plaintiffs' Capital Contributions**

36.   After the formation of the Company, it undisputed that Roy made capital contributions into the Company's bank account at JP Morgan Chase totaling $183,900. It also is undisputed that IK made capital contributions to the Company's Chase bank account totaling $179,850.[3]

37.    For his part, Meregalli cannot identify any sum of money that he deposited as a capital contribution into the Company's bank account. The only actual deposit of money into the Company's accounts that Meregalli claims as his own is a check, dated June 27, 2014, in the amount of $109,917.00, issued to the Company from the escrow account of an attorney, Rocco Lamura. However, Meregalli admitted in a deposition that this money came from a close friend, Alberto Baldaccini, and was intended for a potential investment by Baldaccini into the Company. Meregalli said that, because of his friendship with Baldaccini, "it was basically my money." But

---

[2] In an email to Diego Streliotto, of IK, Meregalli acknowledged that capital contributions shift the members' percentage interests, when he proposed that the members treat a loan by IK as a capital contribution, "adjusting the shares accordingly."

[3] IK also made two loans to the Company, a Loan Agreement, dated August 6, 2014, under which it lent the Company $30,000, and a Loan Agreement, dated December 2, 2015, under which it lent the Company $20,000.

that makes no sense.[4]

## G.    Superior Performs Landlord's Work in the Buildout, at Superior's own Expense, Paying Vendor Invoices Totaling $254,417.51

38.    Between August 2013 and August 2014, Superior spent a "small fortune" performing Landlord's Work at its own expense. In doing so, Superior used the services of certain contractors and vendors ("Landlord's Contractors"), including:

- ABR Plumbing & Heating, Inc. (plumbing)

- Jagiello Construction Corp. (construction and demolition)

- Richard C. Mugler Co., Inc. (scaffolding)

- O.M. Electric, Inc. (electric)

- Metro Air Comfort, Inc. (air conditioning and HVAC)

- Prince Lumber Co., Inc. (lumber)

- King C Iron Works (iron)

- Thomas Tsue (Tenant's architect)

- Geiger Engineering, P.C.

- Chen Engineering Services

- Carpenters, including Mark Braithwaite, Stephen Deane, Gillet Hood, Jabari Lovell, Vincent Martin, Dwayne McDougal, Anthony Murray, Kevin Pass, and Loxley Williams

39.    In connection with Landlord's Work on the Restaurant Premises, Superior paid Landlord's Contractors no less than $283,856.51, of which amount it obtained reimbursement of

---

[4] Rather than an actual capital contribution, the transaction appears to be part of a fraud. A letter from attorney Lamura to the U.S. Embassy in Rome states that the money was placed in escrow "until the transfer of [the Company's] shares from Alberto Baldaccini to Paolo Mergalli." The letter thus falsely implies that Meregalli himself deposited the funds—to be exchanged in a transaction for the purchase of shares of the Company from Baldaccini. But Meregalli admitted in his deposition that the money came from Baldaccini. And Baldaccini was never a member of the Company, and thus had no shares to sell.

$29,439 from the Company by way of a rental invoice, for a total amount paid by Superior out of its own pocket of $254,417.51. Meregalli later fraudulently represented to Plaintiffs that he paid these amounts himself, out of his own pocket. However, at his deposition, Meregalli admitted that Superior paid a "big chunk" of the costs in the buildout. *See* Meregalli Dep. Tr. 192 ("Yes, but you're right, a lot of things has been paid by Superior Management. A big chunk of the work has been paid [by] him."). Meregalli could not dispute that Superior paid $283,000 in connection with the buildout.

**H.   Meregalli Causes the Company to Pay at Least $138,642 for its Share of the Buildout from the Company's Bank Account**

40.    In connection with the buildout of the Restaurant Premises, Meregalli also caused the Company to hire certain contractors and vendors to provide goods and services not within the scope of Landlord's Work. The Company's books and records establish that all, or substantially all, of this additional work was paid for by the ***Company***—*i.e.*, with the capital contributed by Plaintiffs. Meregalli cannot document that he paid any substantial amount of these costs with his own personal funds.

41.    Chief among these costs, Meregalli caused the Company to hire Tri-State Construction Corp. ("Tri-State") to install various finishes and fixtures in the Restaurant Premises. As shown by the Company's own checkbook and Chase bank records, the Company paid Tri-State no less than $109,203.00 from its own account, as follows:

- Check 1011, 2/17/2014 for $10,000

- Check 1022, 3/4/2014 for $10,000

- Check 1019, 3/21/2014 for $3,803

- Check 1020, 4/21/2014 for $15,000

- Check 1027, 5/14/2014 for $20,000

- Check 1028, 5/29/2014 for $20,000

- Check 1034, 6/10/2014 for $20,000

- Check 1057, 8/1/2014 for $5,000

- Check 1061, 8/12/2014 for $5,000

- Check 1064, 8/18/2014 for $400

42.    Meregalli admitted in his deposition that the Company's records indicate that these payments were paid from the Company's own bank account, and are expenses of F&W. *See* Meregalli Dep. Tr. at 218-19, 222, 261 & 256-57 ("Q. Okay. We looked at a bunch of check stubs, correct? A. We looked at the bank stubs. There is some payments made to Tri-State."); *see id.* at 263 ("Q: I'm not asking if you paid. I'm asking if you paid a hundred percent of the Tri-State bills. A. We already established that I didn't pay a hundred percent because part has been paid by the company, but I don't know what is the total amount because I don't recall.").

43.    Meregalli also caused the Company to reimburse buildout costs advanced by Superior—including the sum of $29,439 noted above—which Superior charged to the Company through its rental account. Between these two categories of expenses—Tri-State Construction and reimbursement of Superior—it is undisputed that at least $138,642 in buildout costs later claimed by Meregalli in fact were paid by the Company.

## I.    Meregalli Conceals from Plaintiffs that he Made No Capital Contributions

44.    Meregalli knew that he did not pay the costs of building out the Restaurant Premises with his own personal money, but rather that the costs had substantially been paid for by Superior and the Company. Under § 6.2 of the Company's Operating Agreement, based upon the members' actual proportionate contributions of capital, the percentage interests of Plaintiffs should have substantially increased, and the percentage interest of Meregalli should have

substantially decreased. If calculated correctly, among other things, Meregalli would have lost his position as the majority member of the Company, and would have been subject to replacement as Managing Member of the Company.

45.    To avoid this outcome, Meregalli did not truthfully and accurately account for the members' contributions of capital. Instead, he made the demonstrably false claim that he paid the costs of the build out of the Restaurant Premises personally, with his own funds, and knowingly incorporated this false information into the Company's financial statements—as well as into the Company's federal and state tax returns.

**J.    Mulino a Vino Opens**

46.    In August 2014, Mulino a Vino opened for business. The Restaurant received favorable reviews and, according to financial statements prepared by Pernin and Nipren, began to break even in 2016, within eighteen months of opening. The Restaurant was poised for success and profitability, and Meregalli promised to expand the Restaurant into several new locations in the United States.

**K.    Meregalli Misapplies Company Funds**

47.    Unbeknownst to Plaintiffs, from inception, in breach of his fiduciary duties, Meregalli treated the Company's bank accounts as his own, and used them to enjoy a jet-setting lifestyle of frequent air travel to Florida, California and Italy, luxury meals and entertainment, and purchases of clothing and sundries.

48.    The Company's bank records reflect at least the following objectively inappropriate expenses:

- **Air travel**. Meregalli spent thousands of dollars of Company funds on air travel with no legitimate business purpose for a local restaurant, including: travel to and from Los Angeles from September 8-13, 2014; travel to Toronto on October 30, 2014; travel to Miami, from December 13-16, 2014; travel to Fort

Myers, FL, from January 9-13, 2015; travel to Fort Myers, FL, on April 20, 2015; travel to and from Milan, IT, November 24-29, 2015; travel to Fort Myers, FL, by Meregalli, Gianluca Meregalli and Amandine Chow, from January 4-7, 2016; travel to Milan IT on March 30, 2016; a $747 Alitalia ticket, presumably for travel to Italy, purchased on July 5, 2016.

- **Meals and drinks**. Meregalli spent thousands of dollars of Company funds on meals and drinks purchased at New York City restaurants and bars, including Balthazar Bakery, Bathtub Gin, La Bergamote, Buvette, Chelsea Thai, Coppelia, Happy Endings, Momofuku, The Musket Room, Papa Kebab, Le Pain Quotidien, The Place, Santina, Scarpetta and La Sirena. Meregalli further spent significant amounts on food, drink and clothing purchases while inappropriately traveling at the Company's expense, including in Fort Lauderdale, FL, on October 23, 2015, including at Runner's Depot, Seasons 52 and Starbucks; and at Fiola Mare (Washington, D.C.).

- **Entertainment**. Meregalli spent hundreds of dollars in Company funds on personal entertainment, including, $209.97 at Mountain Creek Zipline, in Mountain Creek, New Jersey, on August 31, 2015; and $165.73 and $211.88 at Frames New York bowling alley, on October 26, 2016. Meregalli also spent hundreds of dollars in Company funds on numerous apparent in-game purchases from a Microsoft X-Box.

- **Clothing.** Meregalli spent hundreds of dollars of Company funds on purchases of clothing and sports equipment, including a $88 purchase at Urban Outfitters on May 27, 2015; a $149.60 purchase at Zara on December 14, 2015; a $39 purchase at Uniqlo, on July 11, 2016; a purchase of $45 in cycling equipment at Echelon Cycles on March 21, 2016; a purchase of $76.16 in clothing at Paragon Athletic on August 23, 2016, and a purchase of $79.45 in clothing at Zara in Rome on October 19, 2016.

- **Taxis and sundries.** Meregalli spent hundreds of dollars of Company funds on countless taxi and Uber rides, and numerous small purchases at CVS and Duane Reade pharmacies.

49.     In addition, the Company's bank statements reflect that Meregalli failed to pay various taxes, causing the Company to incur $35,848.18 in court ordered levies of Company funds (denoted "NAS-COAL"), in the amount of $1,075.00 on September 1, 2015, $18,148.58 on

September 15, 2015, $7,100.38 on October 1, 2015, $25.09 on October 31, 2015, $25.09 on

November 1, 2015, and $9,474.04, on December 1, 2015.

**L.    Meregalli Fails to Pay the Company's Taxes**

50.    For nearly three years, between July 2013 and June 2016, Meregalli failed to file

state and federal tax returns for the Company, and failed to pay the Company's taxes. As a result,

the Company incurred substantial penalties to state and federal tax authorities. The Company then

was forced to incur the additional expense of hiring accountants and lawyers to negotiate with the

tax authorities in connection with these needless liabilities.

51.    In addition, Meregalli failed to pay as much as $65,000 in payroll and sales taxes,

which Meregalli sought, retroactively, to apportion among the Members. The untimely payment

such taxes caused the Company to incur further penalties.

**M.    Meregalli Purports to Document his Phony Capital Contributions**

52.    In or about August 2015, as part of his fraudulent scheme against Plaintiffs,

Meregalli and the Company's outside accountants, Nipren LLC, began preparing a balance sheet

for the Company as of December 31, 2014 that would credit Meregalli with making the $600,000

in capital contributions he needed in order to justify a continued 60% interest in the Company. In

connection with doing so, Nipren sought documentation from Meregalli concerning his purported

personal capital contributions to the Company in connection with the build out. Meregalli had no

such documentation, because he had paid none of the expenses himself.

53.    By email dated August 10, 2015, Meregalli falsely represented to Superior that he

needed copies of the invoices for Landlord's Work—which Meregalli knew Superior had paid

itself—purportedly for purposes of the Company's application for insurance coverage. Unaware

of Meregalli's purpose, Superior dutifully provided Meregalli with copies of the estimates and

invoices that had been issued to it by Landlord's Contractors.

54.     Meregalli knew and understood that Superior had paid all of the amounts due to Landlord's Contractors. Indeed, a year after the build out was complete, Meregalli still did not possess copies of the estimates and invoices, but had to obtain them from Superior.

55.     In August 2015, at Meregalli's direction, Nipren reached out to certain of Landlord's Contractors, including King C Iron Ironwork, seeking details on the actual amounts Superior paid each vendor based on the many inconclusive written estimates that Nipren had received.

56.     On or about September 9, 2015, Nipren prepared a balance sheet for the Company, dated as of December 31, 2014, which among other things falsely credited Meregalli with (a) all of the amounts paid by Superior, totaling $254,417.51, as well as (b) amounts paid by the Company itself, including all amounts paid by the Company to Tri-State, totaling at least $109,203.00, and reimbursements to the Landlord, totaling at least $29,439.00. Nipren also credited Meregalli with paying a number of additional costs and expenses that in fact were paid for with assets of the Company. In whole, the balance sheet falsely credited Meregalli with making a total of $635,245.72 in personal contributions of capital to the Company.

57.     Meregalli directed Nipren to incorporate their false and misleading accounting of Meregalli's purported capital contributions into each of the Company's subsequent financial statements, which they knew and understood would be provided to the Company's members, including Plaintiffs.

58.     In 2016, at Meregalli's direction, Pernin and Nipren further provided their false and misleading financial statements to the Company's tax accountants, intending that they rely upon the truth and accuracy of the representations contained therein. As a result, the Company's 2013, 2014, 2015 and subsequent federal and state tax returns, each prepared in 2016, falsely

represented that Meregalli made $600,000 in capital contributions to the Company.

**N.    Plaintiffs Discover Meregalli's Phony Capital Contributions**

59.    At a meeting of the members on October 3, 2016, Meregalli stated that the Company required an infusion of additional capital. During the meeting, Meregalli represented—based upon Defendants' financial statements—that he had made significant capital contributions to the Company, and insisted that the other Members were obligated to make substantial additional contributions as well. *See id.* IK, through its counsel, questioned Meregalli's claim to have contributed substantial additional capital, and demanded documentation.

60.    On November 15, 2016, Meregalli provided IK's counsel with the Company's late-filed 2013, 2014 and 2015 tax returns, which contained Defendants' false and misleading accounting of Meregalli's phony capital contributions. Thereafter, Meregalli called a meeting of the Members for November 28, 2016, to solicit $400,000 in additional capital contributions to keep the allegedly failing restaurant afloat. At the November 28, 2016 meeting, Meregalli asserted that he made $600,000 in capital contributions in-kind, by paying the Company's initial expenditures—including for the build out of the Restaurant Premises—directly with his own personal funds. As demonstrated above, this statement was false. *See* Meregalli Dep. Tr. at 289-90 (admitting he did not pay invoices totaling $599,000 in 2014).

61.    In response, IK demanded complete records substantiating Meregalli's purported $600,000 in capital contributions, as well as records substantiating the purported Meregalli Loans. IK reiterated its request at a subsequent meeting of the members of the Company, on December 8, 2016.

**O.    IK Demands the Company's Books and Records**

62.    On December 9, 2016, IK issued a formal demand under Article 4.5 of the Operating Agreement for financial records of the Company necessary to determine whether

Meregalli made the alleged capital contributions upon which he premised his demand for further capital contributions by the other Members. Thereafter, on February 21, 2017, IK filed a proceeding under Article 78 of the CPLR and the Limited Liability Company Law, captioned *In re Meregalli USA*, Index No. 151708/2017 (the "Books and Records Proceeding"), to compel the Company to provide the requested books and records.

## P.    Marcum Finds Misconduct by Meregalli

63.    After service of the Petition in the Books and Records Proceeding, the Company agreed to schedule an inspection of its books and records by IK's accountants, Marcum LLP ("Marcum"), on April 17, 2017, at the offices of Nipren. Subsequently, in a report, dated May 25, 2017 (the "Marcum Report"), Marcum found no record that Meregalli personally contributed any capital to the Company. Although Meregalli and the Company produced a number of proposals and invoices from Landlord's Contractors, they provided no receipts reflecting the amounts actually paid, or documentation that Meregalli himself paid any amount from his own personal funds. [5]

## Q.    Nipren Presents a False and Misleading Response to Marcum

64.    In or about July 2017, Nipren provided a false and misleading response to the Marcum Report, upon which Meregalli intended Plaintiffs to rely. In it, Meregalli continued to claim credit for with personally paying the build out costs—which actually were paid by Superior and the Company—as his capital contributions to the Company.

---

[5] The Marcum Report further noted additional misconduct by Meregalli, including: (a) Meregalli's use of Company funds for trips to Florida for himself, his girlfriend, and Pernin, of Nipren; (b) trips to Italy that appear unrelated to the Company's business; (c) excessive fees paid to Company's bookkeeper and tax accountants; (d) Meregalli's repeated late payment of rent, causing the Company to incur needless late fees; and (e) the Meregalli Loans, dubious related party transactions, none of which were disclosed to the other Members.

65.    A table in Nipren's report represented that Meregalli had made $504,328.72 in capital contributions to the Company. At Meregalli's direction, Nipren continued to credit Meregalli with paying all amounts paid by Superior to Landlord's Contractors as Landlord's Work, including to ABR Plumbing and Heating, Pella Windows, King C Ironworks, Jagiello Construction, and Metro Air. In doing so, Defendants fraudulently or negligently triple-counted one ABR Plumbing invoice, which had been twice amended, as though it were three separate invoices. In his deposition, Meregalli admitted that Nipren credited him with buildout costs that had been paid by Superior. Meregalli also continued to claim credit for personally paying the invoices of Tri-State, even though the Company's checkbook and bank records reflect that Tri-State was paid with the funds of the Company. In his deposition, however, Meregalli admitted that if Nipren credited him with payments that had been made by the Company, that would be "wrong." Meregalli's counsel further conceded that Superior and F&W made some of these payments.

66.    As a result of the foregoing false representations concerning his capital contributions, Meregalli was able to confuse and defraud the Company's lawyers at Tartar Krinsky and delay a determination that Plaintiffs actually held a controlling interest in the Company.

**R.    Meregalli Threatens to Liquidate the Company**

67.    On July 24, 2017, Meregalli circulated minutes of a meeting he held by himself, without a quorum, on July 10, 2017. The minutes threatened that unless the other Members contribute additional capital by July 31, 2017, Meregalli would "liquidate the Company." Meregalli based his purported authority to liquidate the Company upon his position as Managing Member, which in turn was based upon Defendants' false and misleading accounting of Meregalli's contributions of capital.

68.     In fact, properly calculated, taking account of the members' documented contributions of capital, Plaintiffs collectively owned substantially in excess of 50% of the capital interests in the Company. Under the terms of the Company's Operating Agreement, Plaintiffs held a sufficient interest to remove Meregalli as manager.

69.     On August 1, 2017, Plaintiffs, constituting a majority of the membership interests of the Company, took action by written consent removing Meregalli as manager, appointing a replacement manager, and directing Meregalli to cease his activities as manager of the Company. Meregalli did not recognize Plaintiffs' authority and, with the support and assistance of Defendants, maintained the position that he held a 60% membership interest in the Company.

**S.     Meregalli forms Raviolo and MAV SOHO with the Company's Assets**

70.     When Plaintiffs caught on to Meregalli's scam, and began asking tough questions, Meregalli formed a competing restaurant, Raviolo, using the Company's chef and intellectual property.

71.     Meregalli also withdrew hundreds of thousands of dollars from the Company's account, including $140,000 on January 5, 2018, which he spent on his own purposes. On January 5, 2018, Meregalli also transferred $90,000 to the Company's then-attorneys, Ferrante PLLC (the "Ferrante Firm"), an amount grossly in excess of the value of any legitimate legal services that Ferrante Firm was providing to the Company. Several months later, on April 16, 2018, the Ferrante Firm returned a portion of the money in a check to Meregalli, personally, in the amount of $18,438.71.

72.     Meregalli tried to induce the Company's landlord to enter into a separate lease for MAV—in a new entity that did not include Plaintiffs. When the Company's landlord declined to do so, Meregalli took MAV to a new location—the Hotel Hugo—under the name MAV SOHO. On January 31, 2018, Meregalli's authorized agents stated that MAV SOHO was "Mulino a Vino

– under a newly formed LLC." On May 15, 2018, Meregalli transferred $100,000 from the Company's bank account (No. 8665) to the account of that newly formed limited liability company, HHF&B LLC. On that same date, HHF&B entered into a lease with Fortuna Realty Soho Hotel LLC, paying it an initial deposit of $42,000—apparently in cash—which is traceable directly to the Company's funds.

73.     After May 15, 2018, MAV SOHO began carrying out the Company's restaurant in the new location, with Meregalli as manager, Massimiliano Eandi as its chef, and at least four former employees of the Company.

74.     At the same time as he was stripping assets of the Company, Meregalli stopped paying rent to the Company's landlord, Superior. In April 2018, Superior obtained a judgment of possession of the premises. And, on May 23, 2018, Meregalli moved MAV out of its former location to the Hotel Hugo.

**T.      Meregalli's Motion For Summary Judgment is Denied in the State Court Action**

75.     On August 17, 2017, Plaintiffs brought action against Meregalli, the Company and Raviolo in the Supreme Court of the State of New York, in a matter captioned *Roy Food and Wine LLC, I.K. Finanziara SRL, individually and as members of F & W Int'l LLC, v. Paolo Mergalli, F&W Int'l LLC, and First LLC*, Index No. 655430/2017.

76.     By Order, dated September 25, 2019, the Honorable O. Peter Sherwood denied the Defendants' motion for summary judgment as to Plaintiffs' breach of fiduciary duty, breach of contract, unfair competition, misappropriation of a corporate opportunity and demand for an equitable accounting.

77.     Until the Petition was filed, the State Court Action was trial ready on Plaintiffs' claims against Meregalli.

**Defendant's Petition**

78.     On March 7, 2020, Defendant filed the instant Petition, in an attempt to frustrate

Plaintiffs' recovery in the State Court Action.

79.     As set forth below, Defendant's Petition, and the accompanying Schedules, are

deficient in numerous respects. Upon information and belief, Defendant—who comes from a

wealthy family in Italy—intentionally failed to disclose the existence of substantial assets in an

attempt to defraud Defendant's creditors, including Plaintiffs.

80.     Upon information and belief, Item 1 of Defendant's Schedule of Property, Petition

at 12, fails to include all personal property in which Defendant has an interest, including bank

accounts located in Europe.

81.     Upon information and belief, Item 17 of Defendant's Schedule of Property,

Petition at 12, fails to include all bank accounts in which Defendant has an interest, including

bank accounts located in Europe.

82.     Item 19 of Defendant's Schedule of Property, Petition at 12, falsely and

inaccurately states that Defendant owned 100% interests in the Company, Raviolo, HH F&B LLC

and Concepts Hospitality Group LLC. In fact, Plaintiffs are owners of at a minimum of 35% of

the equity in the Company, and evidence developed in the State Court Action establishes that

Defendant did not own 100% of the equity in any of Raviolo, HH F&B LLC or Concepts

Hospitality Group LLC.

83.     Upon information and belief, Defendant's Schedule of Property fails to include a

expensive, high-end triathlon bicycle, worth approximately $10,000, owned by Defendant, of

which there are pictures on the internet.

84.     Item 33 of Defendant's Schedule of Property, Petition at 14, values at $10,000,

Defendant's claim against Fortuna Realty Realty Soho Hotel LLC (the "Fortuna Claim"), captioned *Paolo Meregalli V Fortuna Realty Soho Hotel, LLC*, Index 655373/2019. In Item 2 of Defendant's Schedule of Property Claimed as Exempt, Defendant declares the Fortuna Action as worth only $10,000, and thus exempt. However, a review of the pleadings in the Fortuna Action indicate that Defendant's claim may be worth many times that amount, and thus should be available to satisfy Defendant's creditors, including Plaintiffs.

85.    Item 4.2 of Defendant's Schedule of Creditors, Petition at 20, fails to disclose a judgment obtained by the Company's former landlord, Superior, against Defendant.

86.    Item 4.2 of Defendant's Schedule of Creditors, Petition at 29, fails to disclose Plaintiff IK as a creditor of Defendant.

**COUNT I: OBJECTION TO DEBTOR'S DISCHARGE UNDER
SECTION 523(a)(4) OF THE BANKRUPTCY CODE**

87.    Plaintiffs repeat and re-allege the preceding allegations set forth in this Complaint as if fully set forth herein.

88.    Bankruptcy Code § 523(a)(4) provides, in relevant part, that: (a) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny . . . ."

89.    All or part of the debt owed to Plaintiffs, as set forth in the State Court Action, is non-dischargeable as it is a debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny within the meaning of Bankruptcy Code § 523(a)(4).

**COUNT II: OBJECTION TO DEBTOR'S DISCHARGE UNDER
SECTION 523(a)(6) OF THE BANKRUPTCY CODE**

90.    Plaintiffs repeat and re-allege the preceding allegations set forth in this Complaint

as if fully set forth herein.

91.    Bankruptcy Code § 523(a)(6) provides, in relevant part, that: (b) A discharge under section 727, 1141, 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt— . . . (6) or willful and malicious injury by the debtor to another entity or to the property of another entity . . ."

92.    All or part of the debt owed to plaintiff, as evidenced by the Judgment entered against the Debtor, is non-dischargeable as it is a debt for willful and malicious injury caused by the Debtor within the meaning of Bankruptcy Code § 523(a)(6).

### COUNT III: OBJECTION TO DEBTOR'S DISCHARGE UNDER SECTION 727(a)(4)(A) OF THE BANKRUPTCY CODE

93.    Plaintiffs repeat and re-allege the preceding allegations set forth in this Complaint as if fully set forth herein.

94.    Bankruptcy Code § 727(a)(4)(A) provides, in relevant part, that: "(a) The court shall grant the debtor a discharge, unless . . . (4) the debtor knowingly and fraudulently, in or in connection with the case . . . (A) made a false oath or account."

95.    Here, as set forth above, Debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account, in that he intentionally omitted to disclose his true financial affairs in his Petition, accompanying Schedules, and the Statement of Financial Affairs.

96.    By virtue of the Debtor's false representations and omissions, and the oath he took concerning the veracity of his submissions, the Debtor's discharge should be denied under Bankruptcy Code § 727(a)(4)(A).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.     For an order of this Court denying the Debtor's discharge under Bankruptcy Code

§§ 523(a)(4), 523(a)(6) and 727(a)(4)(A).

B.     For an order awarding such other and further relief as this Court may deem just

and proper.

DATED:   New York, New York
         June 8, 2020

Respectfully submitted,

PRESS KORAL LLP

By:   */s/ Matthew J. Press*
      Matthew J. Press
      641 Lexington Avenue, 13th Floor
      New York, NY 10022
      Telephone: (212) 922-1111
      Facsimile:  (347) 342-3882
      mpress@presslawfirm.com

      *Attorneys for Creditors Roy Food and Wine LLC and*
      *I.K. Finanziaria S.r.L., individually and derivatively*
      *as members of F&W International LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

_____/s/_____

Matthew J. Press